DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Defendant-Appellant William Lamont Anderson has appealed from his convictions in the Summit County Court of Common Pleas of aggravated murder with a firearm specification, tampering with evidence, having a weapon under disability, and possession of cocaine. This Court affirms.
 I {¶ 2} At 2:00 a.m. on October 22, 2004, the Akron Police Department ("APD") received a call reporting a shooting at 825 Greenwood Street in Akron, Ohio. The victim, Dewayne Ball, was shot in the head, arm and chest as he was getting out of his vehicle. At 2:12 a.m., Stephanie Johnson called 911 to report a suspicious person near the back of her home at 916 Cordova Street in Akron, Ohio. When APD officers arrived on scene, they found Defendant-Appellant William Lamont Anderson hiding behind a dumpster at the VFW building on the corner of Cordova and Copley Road. Appellant was subsequently arrested and identified by Angela White, the victim's girlfriend, who was in the vehicle at the time of the shooting.
 {¶ 3} On November 3, 2004, Appellant was indicted on one count of aggravated murder, in violation of R.C. 2903.01(A), a special felony; one count of tampering with evidence, in violation of R.C. 2921.12(A)(1), a felony of the third degree; one count of having a weapon under disability, in violation of R.C. 2923.13(A)(3), a felony of the third degree; one count of possession of cocaine, in violation of R.C. 2925.11(A), a felony of the fifth degree; and one count of trafficking in cocaine, in violation of R.C. 2925.03(A)(2), a felony of the fifth degree. A firearm specification attached to the aggravated murder count, in violation of R.C. 2941.145. Appellant pled not guilty to all charges.
 {¶ 4} A jury trial commenced on July 11, 2005. Prior to trial, the State dismissed the charge of trafficking in cocaine. At the close of the State's case in chief, Appellant made a Crim.R. 29 motion for acquittal. Appellant timely renewed his motion at the close of evidence. On July 15, 2005, the jury found Appellant guilty of aggravated murder, with a gun specification; tampering with evidence; having weapons while under disability; and possession of cocaine. On July 20, 2005, the trial court sentenced Appellant to life in prison with parole eligibility in twenty years for aggravated murder plus three years on the gun specification; four years in prison for tampering with evidence; four years in prison for having weapons under disability; and eleven months in prison for possession of cocaine.
 {¶ 5} Appellant has timely appealed, asserting four assignments of error. Assignments of error number two and four have been consolidated to facilitate our review.
 II Assignment of Error Number One
"THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR MISTRIAL AFTER PERMITTING THE STATE TO PRESENT TESTIMONY BEFORE THE JURY THAT MR. ANDERSON INVOKED HIS RIGHT TO REMAIN SILENT."
 {¶ 6} In his first assignment of error, Appellant has argued that trial court erred when it denied his motion for a mistrial. Specifically, Appellant has argued that the trial court permitted the State to present testimony to the jury that Appellant had invoked his right to remain silent. We disagree.
 {¶ 7} An appellate court's review of the denial of a motion for a mistrial is for an abuse of discretion. State v. Sage
(1987), 31 Ohio St.3d 173, 182. An abuse of discretion connotes more than a mere error in judgment; it signifies an attitude on part of the trial court that is unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219. When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. Berk v. Matthews (1990), 53 Ohio St.3d 161, 169.
 {¶ 8} In the present case, Appellant's trial counsel requested that the court prohibit the prosecution from commenting on Appellant's silence in any way. The trial court instructed the State not to comment on the fact that Appellant chose to remain silent when questioned by the police at the scene. Appellant has argued that, contrary to the court's instruction, the State attempted to enter a tape of Appellant invoking his right to remain silent and made repeated references during its case-in-chief to Appellant's silence. Appellant moved for a mistrial after numerous objections to that particular line of questioning by the State. The trial court denied the motion.
 {¶ 9} Appellant has first challenged the redirect examination of Detective Brian Reilly, of the APD. Detective Reilly was assigned to investigate the Greenwood shooting. During Detective Reilly's redirect examination, the following dialogue occurred between the State and Detective Reilly:
"Q: Detective Reilly, when we talk about Angela White and the shooting, you were asked who is the other person. Dewayne Ball is dead. Never got a statement from him, did you?
"A: No, I was unable to.
"Q: Angela White has given at least two statements, one to you and one to Lieutenant Shearer?
"A: Correct.
"Q: And she has told you that William Anderson was present at that shooting?
"A: Yes.
"Q: And in no uncertain terms, she says it's him?
"A: Positively.
"Q: So one other person is left to tell us about what happened there according —
MR. SINN: Objection. Leading.
THE COURT: Overruled.
"Q: According to what you know from Angela White?
"A: Correct."
 {¶ 10} Appellant has claimed that these statements are an attempt to raise the inference that Appellant was guilty because he did not make a statement. We disagree. At no time did the State ever ask Detective Reilly if he took a statement from Appellant. At no time did Detective Reilly state that Appellant did not or would not give him a statement, a fact that the trial court considered while discussing Appellant's motion for a mistrial. Ultimately, the State turned the witness over to the defense without ever having elicited whether Appellant gave him a statement or not.
 {¶ 11} Detective Reilly also testified that Ms. White, Mark Woods and Appellant were all present at a prior incident at the Massillon Road hotel.[1] He testified that White and Woods both made statements. At that point, the State began to ask a question regarding Detective Reilly's interview with Appellant when defense counsel objected before the State could complete the question. The court allowed the State to finish the question, and the State asked Detective Reilly what he had said to Appellant. Detective Reilly responded that he informed Appellant that he was taping the conversation, that there are two sides to every story and that he wanted to get Appellant's story. Defense counsel objected and was overruled. Defense counsel then moved for a mistrial and was denied. Next, the State asked Detective Reilly if the above procedure was done solely for Appellant's benefit, and he responded that he routinely followed the procedure. The State then turned the witness over to the defense.
 {¶ 12} This Court cannot find an inference in the above testimony that the Appellant's silence constituted his guilt. Nowhere in Detective Reilly's testimony did he ever state that Appellant did not give him a statement. Again, nowhere in the above testimony did the State mention Appellant's silence. In fact, the State's line of questioning was directed at what Detective Reilly said to Appellant, not what Appellant did not say to Detective Reilly. Even if the State intended on pursuing the line of questioning Appellant proposes, we cannot find the State acted improperly because the prosecutor terminated that line of questioning. See State v. Lute (Nov. 22, 2000), 9th Dist. No. 99CA007431, at *3.
 {¶ 13} Furthermore, we find that even if the disputed testimony crossed the line of propriety, the error was harmless. Under the harmless error doctrine, "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Crim.R. 52(A). "Where evidence has been improperly admitted in derogation of a criminal defendant's constitutional rights, the admission is harmless `beyond a reasonable doubt' if the remaining evidence alone comprises `overwhelming' proof of defendant's guilt." State v. Williams
(1983), 6 Ohio St.3d 281, 290, quoting Harrington v. California
(1969), 395 U.S. 250, 254. See State v. Wright, 9th Dist. No. 05CA008675, 2006-Ohio-926, at ¶ 8. Further, "`[w]here there is no reasonable possibility that unlawful testimony contributed to a conviction, the error is harmless and therefore will not be grounds for reversal.'" State v. Tate, 9th Dist. No. 21943,2005-Ohio-2156, at ¶ 22, quoting State v. Brown (1992),65 Ohio St.3d 483, 485.
 {¶ 14} Based on our analysis of Appellant's second and fourth assignments of error, this Court concludes that even if the State's questions and the elicited testimony were improper, an "overwhelming" amount of circumstantial and direct evidence was presented as to Appellant's guilt. We find, in light of the evidence against Appellant, that there is no reasonable probability that the disputed testimony contributed to Appellant's conviction. Further, we find that the extent of the comments was not pervasive, and that there is no indication in the record that the State stressed an inference of guilt to the jury or attempted to capitalize on Appellant's silence during closing arguments. See State v. Thomas, 1st Dist. No. C-010724, 2002-Ohio-7333, at ¶ 13.
 {¶ 15} Appellant has cited State v. Maggard (June 4, 1999), 2d Dist. No. 17198 in support of his argument. However, Maggard
is distinguishable from the instant matter. In Maggard, the prosecution made specific remarks concerning the defendant's silence and questioned what the defendant stated, or more correctly, what he did not say, when he turned himself in. In this case, Appellant has conceded that the State did not make any direct statement regarding Appellant's silence and has hinged his argument on the possibility that the State raised an inference. We find Maggard to be inapposite.
 {¶ 16} Appellant has also argued that the testimony elicited from Officer Thomas Donahue by the State that "[Appellant] asked for an attorney and I stopped questioning at that point and that's kind of when I noticed I think this call is going to be related to the Greenwood shooting" somehow created an inference of Appellant's guilt to due his silence. We disagree. The record is clear that Officer Donahue had elicited significant information from Appellant prior to his invocation of the right to remain silent from which Officer Donahue could have concluded that Appellant's conduct was somehow related to the Greenwood shooting. Such information included the following: (1) that Appellant was lurking behind a dumpster at approximately 2:15 a.m.; (2) that two baggies of powder cocaine were found on his person; (3) that Appellant's stated residence was relatively far away from where he was found; (4) that Appellant's brother dropped him off at the dumpster, but was coming back to pick him up; (5) that Appellant had a large knot on his forehead and a small amount of blood on his white t-shirt; (6) that he had come from a club; and (7) that he had been involved in a fight at the club.
 {¶ 17} Finally, Appellant has argued that the State "further commented on [Appellant's] silence moments later" in the transcript. A review of the transcript reveals that the State simply clarified, through Officer Donahue's testimony, that he stopped questioning Appellant because he was legally required to do so.
 {¶ 18} This Court concludes that the contested colloquies in no way raise the inference that Appellant's silence is an indication of guilt. Therefore, we cannot conclude that the trial court abused its discretion when it denied Appellant's motion for a mistrial.
 {¶ 19} Appellant's first assignment of error lacks merit.
 Assignment of Error Number Two
"THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL MADE AT THE CLOSE OF THE STATE'S CASE. SUFFICIENT EVIDENCE WAS NOT PRESENTED ON EACH OF THE ELEMENTS [OF] THE OFFENSES SUCH THAT THE CASE COULD PROCEED TO THE JURY WHICH WAS IN VIOLATION OF APPELLANT'S RIGHT TO DUE PROCESS AND FAIR TRIAL AS GUARANTEED BY THE 4TH, 5TH, 6TH AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AS WELL AS ARTICLE 1, SECTION 10 OF THE OHIO STATE CONSTITUTION."
 Assignment of Error Number Four
"MR. ANDERSON'S CONVICTIONS FOR AGGRAVATED MURDER, TAMPERING WITH EVIDENCE, AND WEAPON UNDER DISABILITY WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF ARTICLE IV, SECTION 3 OF THE OHIO CONSTITUTION."
 {¶ 20} In his second and fourth assignments of error, Appellant has argued that the State failed to present sufficient evidence on each element of the offenses. Thus, Appellant has argued that the trial court should have granted his Rule 29 motion for acquittal, or alternatively, that the jury's verdict is not supported by sufficient evidence. Further, Appellant has argued that the jury's verdict was against the manifest weight of the evidence.
 {¶ 21} Crim.R. 29(A) provides that a trial court "shall order the entry of a judgment of acquittal * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." This Court has held that "[a] trial court may not grant an acquittal by authority of Crim.R. 29(A) if the record demonstrates `that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt.'" State v. Simmons, 9th Dist. No. 22221, 2005-Ohio-1469, at ¶ 6, quoting State v. Wolfe
(1988), 51 Ohio App.3d 215, 216. In making this determination, all evidence must be construed in a light most favorable to the prosecution. Id. Essentially, "sufficiency is a test of adequacy." State v. Thompkins (1997), 78 Ohio St.3d 380, 386.
 {¶ 22} Further, a review of the sufficiency of the evidence and a review of the manifest weight of the evidence are separate and legally distinct determinations. State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at *1. "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." Id., citing Thompkins, 78 Ohio St.3d at 390 (Cook, J., concurring). In order to determine whether the evidence before the trial court was sufficient to sustain a conviction, this Court must review the evidence in a light most favorable to the prosecution. State v. Jenks (1991), 61 Ohio St.3d 259, 273. Furthermore:
"An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id. at paragraph two of the syllabus; see, also,Thompkins, 78 Ohio St.3d at 386.
 {¶ 23} In State v. Roberts, this Court explained:
"[S]ufficiency is required to take a case to the jury. * * * Thus, a determination that [a] conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." State v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462, at *2. (emphasis omitted).
 {¶ 24} In determining whether a conviction is against the manifest weight of the evidence an appellate court:
"[M]ust review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339,340.
 {¶ 25} A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than it supports the other. Thompkins,78 Ohio St.3d at 387. Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. Id. at 388. An appellate court must make every reasonable presumption in favor of the judgment and findings of fact of the trial court.Karches v. Cincinnati (1988), 38 Ohio St.3d 12, 19. Therefore, this Court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Martin (1983),20 Ohio App.3d 172, 175; see, also, Otten,33 Ohio App.3d at 340.
 {¶ 26} Appellant was convicted of aggravated murder, with a gun specification. Pursuant to R.C. 2903.01(A), "[n]o person shall purposely, and with prior calculation and design, cause the death of another[.]" Appellant was also convicted of tampering with evidence. Pursuant to R.C. 2921.12(A)(1), "[n]o person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * [a]lter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]" Appellant was also convicted of having weapons while under disability. Pursuant to R.C. 2923.13(A)(3), "no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if * * * [t]he person is under indictment for or has been convicted of any offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse[.]" Finally, Appellant was convicted of possession of cocaine. Pursuant to R.C. 2925.11(A), "[n]o person shall knowingly obtain, possess, or use a controlled substance."
 {¶ 27} R.C. 2901.22(A) states "[a] person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(B) states "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2925.01(K) defines possession as "having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found."
 {¶ 28} We initially note that the State has argued that even if Appellant was not the principle offender, he is guilty of complicity, and thus, the principle offense. A defendant may be convicted of the principal offense if it is established that the defendant acted in complicity with another. See State v. Riley,
9th Dist. No. 21852, 2004-Ohio-4880, at ¶ 36, citing State v.Herring (2002), 94 Ohio St.3d 246, 251. Complicity has been codified in R.C. 2923.03, which provides, in pertinent part to the instant appeal, that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense[.]" R.C.2923.03(A)(2). The Ohio Supreme Court has dictated the requirements for a conviction of complicity by aiding and abetting:
"To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." State v. Johnson (2001),93 Ohio St.3d 240, syllabus.
In the instant case, the trial court provided an instruction on complicity to the jury.
 {¶ 29} The State elicited the testimony of twenty-one witnesses. Appellant declined to testify and did not offer any evidence. We now turn our attention to a discussion of the evidence presented by the State.
 {¶ 30} Daniel Sunderlin testified as follows. On October 22, 2004, victim Dewayne Ball was working as a DJ at Annabell's, a night club in Highland Square, Akron, Ohio. At some point in the night, he went out for cigarette and observed Mr. Ball involved in a fight. He observed that Mr. Ball was beating the other person "pretty good." Mr. Ball yelled during the altercation, "You want to pull a gun on me, [expletive]? Where is your gun now?" He did not see a gun during the fight. On cross examination, Mr. Sunderlin admitted that he was intoxicated when he observed the fight, and that he and Mr. Ball were friends.
 {¶ 31} Michael Paredes, a bouncer at Annabell's, testified as follows. He observed Mr. Ball fighting in the parking lot. He helped to break up the fight in the parking lot, and afterwards, Appellant was involved in another altercation inside Annabell's. At that time, he broke it up again and escorted Appellant out of the bar. At that time, Appellant left and was in the company of another person.
 {¶ 32} Stephanie Johnson testified as follows. In the early morning hours of October 22, 2004, she called 911 to report a suspicious man walking across her front yard towards her garage. While on the phone with the 911 dispatcher, she observed the suspect cross the street toward some bushes and a dumpster located by the VFW building. She had known Appellant her entire life. Ms. Johnson testified on cross examination that Appellant was not trying to break into her home and that any report by the police trying to characterize his conduct as such would be incorrect.
 {¶ 33} Angela White testified as follows. She had dated Mr. Ball off and on for six months. Mr. Ball lived on Greenwood in Akron. While out one night with Mr. Ball, approximately on October 15, 2004, the couple met up with some of Mr. Ball's acquaintances and went to a house to hang out. Appellant was one of the acquaintances. Once at the house, the three men separated her and Mr. Ball. At that time, Appellant punched her in the face and displayed a gun. Appellant then told her if she did not go with them, that they would hurt Mr. Ball. She had drank a lot, but was not intoxicated to the point of incomprehension. In order to protect Mr. Ball, she yelled at him to go home and that she wanted to stay with the other men. Eventually Mr. Ball left. At that point, she was taken by Appellant and another man to a motel where they both had sex with her. The next morning, Appellant dropped her off near Mr. Ball's house, where she told Mr. Ball the whole story. She did not go to the police because she had no way of identifying the men and thought it would only make things worse.
 {¶ 34} On October 22, 2004, she and Mr. Ball got into an argument at Annabell's concerning her dancing with other people. After the argument, she went to the parking lot to get her car and leave. Mr. Ball followed her and they talked in the parking lot. While they were talking, Appellant came up behind Mr. Ball and smiled at her. A fight ensued. She and Mr. Ball left after the fight. When they arrived at Mr. Ball's house, a white car with two occupants pulled up to them and stopped. At that point, someone got out of the car and shot Mr. Ball as he was opening his door. She observed the driver of the white vehicle get out of the car, walk around her car to the passenger side, and shoot Mr. Ball. She believed she was going to get shot as well. The shooter got in the white car and drove off.
 {¶ 35} Ms. White further testified as follows. She informed Akron detectives that she recognized Appellant, though at the time, she did not know his name. She told the police she believed Appellant was the passenger. During her interview with Detective Reilly, she was terrified, in shock, and "just out of myself." When asked to identify Appellant by Detective Reilly, she initially said no because she was terrified. Only after they had left the scene of Appellant's arrest did she identify Appellant. She did not identify Appellant originally because she thought he could see her through the spotlight and did not want him to know she had identified him. She was unable to identify the shooter, but that she knew Appellant was in the car.
 {¶ 36} On cross examination, Ms. White testified as follows. That over the course of a couple hours, she had approximately eight drinks. She did not know who got out of the car, only that somebody did get out of the car. There were three shots fired. Her description of the shooter and her description of the person whom Mr. Ball fought at Annabell's (now known to be Appellant) were distinctly dissimilar. Regarding the sexual incident the week prior to the shooting, Appellant never verbally threatened to harm Mr. Ball if she didn't go with him. Appellant simply displayed the gun, and she inferred the threat. She did not remember giving Detective Reilly a noticeably different version of events, including: leaving with Appellant only; that Appellant ran out of gas in the middle of nowhere; that they waited two hours for Appellant's friend to arrive with gas; that Appellant took her to a basement in an unknown house in east Akron, where he promptly passed out; and that Appellant and Ms. White did not have sex. The house that she described was actually the motel and that she never said it was a cinder block basement, only that she described it as looking like a cinder block basement.
 {¶ 37} Ms. White testified that during a subsequent interview with detectives, she was very clear that she had been honest with Detective Reilly specifically about the fact that Appellant was not the shooter.
 {¶ 38} Officer Justin Ingham of the APD testified that he responded to the Greenwood shooting within minutes of receiving the call. Upon his arrival, Mr. Ball was lying in the grass, in between the passenger side car door. Officer Ingham testified that Ms. White was hysterical and crying. Ms. White told him about the prior incident involving Appellant and the gun, but never told him that she had had sex with men at a motel. Ms. White described the shooter, but was unable to describe the passenger because he did not get out of the car.
 {¶ 39} Officer Thomas Donahue of the APD testified that he initially responded to the Greenwood shooting, but took the call and responded to 916 Cordova regarding the 911 call made by Stephanie Johnson. The call was dispatched at 2:12 a.m. and he responded at 2:13 a.m. Officer Donahue testified that he proceeded immediately to the trash dumpster which the dispatcher had told him was Appellant's last known location. He ordered Appellant to come out and Appellant did so, with one hand in the air, the other in his pocket, and began walking toward him. Appellant stopped only after numerous warnings. Officer Donahue testified that he cuffed Appellant, searched him, and found a tin box with two baggies of powder cocaine.
 {¶ 40} Officer Donahue testified that he questioned Appellant and that he stated the following: that he said he lived on East Avenue; that his brother dropped him off; that his brother was coming back to pick him up; that he came from a club; that he was in a fight at the club; and that he then requested an attorney. Officer Donahue testified that East Avenue was a reasonable distance away from Cordova. Officer Donahue testified that the following factors indicated to him a connection between the Greenwood shooting and the Cordova suspect: Appellant was involved in an altercation that night; he was on scene at Greenwood and had overhead talk of a fight; he noticed blood on Appellant's shirt; Appellant stated that he lived on East Avenue but that his brother dropped him off on Cordova and was returning to pick him up; and the late hour.
 {¶ 41} Officer Donahue testified that the police eventually found the handgun in a woodpile on Stephanie Johnson's property and that a gunshot residue test was performed on Appellant at the scene.
 {¶ 42} On cross examination, Officer Donahue testified that Appellant had told him he was behind the dumpster urinating. Officer Donahue testified that Stephanie Johnson stated that she had heard a car door slam.
 {¶ 43} Officer Warren Soulsby testified that he found the handgun in a pile of wood and brush and that the grip of the gun was at upward angle with the barrel pointed down, indicating it had been placed there. Officer Soulsby testified that he did not touch the gun, but secured the area and notified his sergeant. Officer Soulsby described the gun as a silver revolver with a wood grain handle.
 {¶ 44} Officer Jeffrey Smith of the APD testified that he responded to the Cordova call. Officer Smith testified that he observed Officer Donahue place Appellant in the back of his cruiser. Officer Smith observed Appellant "pulling his hands up from behind him and licking his hands." Appellant was seated sideways, pulled his hands up to his side, bent over and licked around his thumb and right index finger. On cross examination, Officer Smith testified that Appellant was handcuffed behind his back per standard operating procedure. Officer Smith testified that he personally could not perform the feat of licking his hands while handcuffed behind the back.
 {¶ 45} Detective Donald Frost of the APD testified that he conducted the buccal swab on Appellant and testified to the chain of custody.
 {¶ 46} Martin Lewis, of the Bureau of Criminal Investigation ("BCI"), testified that he conducted the analysis on the gunshot residue kits collected from Appellant and Mr. Ball. He testified that gunshot residue was identified on both the left and right hands of Appellant. Mr. Lewis testified that three primary ways exist to get gunshot residue on the hands: 1) to fire a gun; 2) to be in close proximity to a gun when it is fired; and 3) to handle an item that has gunshot residue on it already. On cross examination, Mr. Lewis testified that gunshot residue on handcuffs could possibly be transferred from the handcuffs to an individual's hands. Mr. Lewis testified that he found eight particles on Appellant's left hand sample and ten particles on Appellant's right hand sample.
 {¶ 47} Michelle Snyder, a forensic scientist at BCI, testified that she analyzed the Taurus .38 caliber special revolver and four spent shell casings for fingerprints. Ms. Snyder testified that she found prints on the gun, but they were insufficient to identify a specific individual. She testified that guns are usually poor receivers for fingerprints because they tend to be oily and the grips are corrugated. She also testified that shell casings seldom have fingerprints because they heat up when fired and evaporate the print.
 {¶ 48} Robert M. Velten, the director of operations for BCI's DNA program, testified he is independently contracted by the APD to analyze substances for possible identification as a controlled substance. Mr. Velten testified that he found both bags of cocaine to weigh 0.29 grams.
 {¶ 49} Jonathan Gardner, a forensic scientist at BCI, testified that he examined the handgun and the four spent cartridges. He testified that the handgun was operational. He testified that due to the nature of the particular make of firearm, he could not say with certainty that the spent cartridges were fired from that gun. However, he testified that the spent cartridges were the correct caliber and that he believed the spent cartridges were found still in the cylinder of the gun. Mr. Gardner testified that all three bullets were consistent with .38 special bullets, but that only the bullet recovered from Mr. Ball's chest could be scientifically determined to have been fired from the handgun in question. The bullets recovered from Mr. Ball's head and from Ms. White's vehicle were too damaged for precise identification.
 {¶ 50} Chad Britton, a forensic scientist at BCI, testified that he examined the clothing of Appellant, Appellant's buccal swabs, and Mr. Ball's DNA card. Mr. Britton testified that Appellant's tee shirt and jeans tested positive for blood.
 {¶ 51} Lynda Eveleth, a forensic scientist at BCI, testified that the blood on Appellant's tee shirt was consistent with his own, but the blood on his jeans was consistent with Mr. Ball's, with an expected frequency of occurrence of one in one hundred sixteen quadrillion five hundred trillion individuals.
 {¶ 52} Diane Carter testified that on October 22, 2004, she worked at the Inn Between, a bar in Highland Square near Annabell's. Ms. Carter testified that she knew Appellant and Mark Woods from their frequenting the Inn Between. Mark Woods and Appellant came into the bar prior to 2:00 a.m. and stayed long enough for Woods to have a drink. Both men were excited and upset. Appellant left at approximately 1:45 — 1:50 a.m. Woods eventually went to Annabell's with the bouncer from the Inn Between, but returned to wait for Appellant. Ms. Carter testified that Appellant never returned. Ms. Carter testified that Appellant left his hat and his coat at the bar. On cross examination, Ms. Carter testified that she did not hear any talk of shooting or killing anyone.
 {¶ 53} Detective Clarence Dorsey, of the APD Crime Scene Unit testified that the spent cartridges were found in the gun itself and not on the ground near the crime scene.
 {¶ 54} Detective Brian Reilly of the APD testified that he got a statement from Angela White and took her to Cordova for identification purposes. Ms. White initially denied that Appellant was involved in the shooting. After some reassuring, Ms. White recanted and stated that Appellant had been involved in the incident on October 15, in the fight at Annabell's, and that he was a passenger in the vehicle at the scene of the shooting. Ms. White was afraid that the suspect could see her and that she might be the next victim because the shooter was still at large.
 {¶ 55} Detective Reilly testified that he eventually returned to the detective bureau and attempted to interview Appellant. He testified that he read Appellant his Miranda rights. Detective Reilly became aware that Angela White's story had changed concerning the incident on October 15 and he visited numerous motels in the area of Massillon Road and East Turkeyfoot Lake Road in an attempt to track down the shooter. Detective Reilly testified that the handgun was traced to 1993 when it was purchased by Kathryn Carol Quear, of New Castle, Pennsylvania.
 {¶ 56} On cross examination, Detective Reilly testified that Ms. White told him that during the shooting, Appellant sat in the passenger's side of the vehicle. Ms. White did not tell him that Appellant had hit her in the face on October 15. Ms. White told him, concerning October 15, that she had left the party with Appellant only and that they were driving to the east side of Akron when they ran out of gas. Ms. White told him that Appellant called a friend on his cell phone to bring him some. Although Ms. White told other police officials they went to a motel, she initially told him they went to an unknown house in east Akron where Appellant passed out and she sat until morning. Ms. White told him that she did not have sex with anyone on October 15. Detective Reilly testified that Mark Woods confirmed they were with Ms. White at the Massillon Road Motel.
 {¶ 57} Dr. George Sterbenz, a forensic pathologist for the Summit County Medical Examiner's office, testified that Mr. Ball had two gunshot injuries, one in the head and another in his left arm. The head wound indicated that the path of the bullet was at an angle parallel to Mr. Ball's skull. Upon hitting his skull, the bullet fragmented and one piece exited his head and another piece penetrated Mr. Ball's brain. Concerning the second gunshot wound, Dr. Sterbenz testified that the bullet entered the left arm, passed through his arm and armpit, and entered into the upper chest or shoulder region, lodging just under the left collarbone. Dr. Sterbenz testified that the gunshot wound to the head was fatal. Dr. Sterbenz also testified that Mr. Ball evidenced indications of blunt force trauma, consisting of small abrasions and scrapes, mainly distributed on the right side of his face, which were beginning to show signs of healing. Based on his examination, Dr. Sterbenz classified the manner of death as homicide.
 {¶ 58} Based upon our review of the record, this Court cannot conclude that the jury clearly lost its way and created a manifest miscarriage of justice when it convicted Appellant for aggravated murder, tampering with evidence, and weapon under disability. See Otten, 33 Ohio App.3d at 340. The record indicates that based on the evidence presented, a reasonable jury could have found Appellant shot Mr. Ball, that he attempted to hide the murder weapon, and that he knowingly possessed said murder weapon while under disability. At the very least, the jury could conclude that Appellant "supported, assisted, encouraged, cooperated with, advised, or incited" the commission of Mr. Ball's murder, based on the direct and circumstantial evidence presented at trial, and thus was complicit in the murder. SeeRiley at ¶ 36; Herring, 94 Ohio St.3d at 251.
 {¶ 59} Further, this Court is unpersuaded by Appellant's arguments concerning Ms. White's credibility. While Ms. White's various statements to the police, specifically those concerning the incident on October 15, 2004, were inconsistent, her ultimate story was corroborated in part by Detective Reilly's interview of Mark Woods. Moreover, while Ms. White initially refused to identify Appellant as a participant in the shooting, her reluctance could be explained by her hysterical and fearful mental state at the time.
 {¶ 60} This Court will not overturn a conviction because the jury chose to believe the testimony offered by the prosecution. See State v. Gilliam (Aug. 12, 1998), 9th Dist. No. 97CA006757, at *2. This Court has held that, "in reaching its verdict, the jury is free to believe, all, part, or none of the testimony of each witness." Prince v. Jordan, 9th Dist. No. 04CA008423,2004-Ohio-7184, at ¶ 35, citing State v. Jackson (1993),86 Ohio App.3d 29, 33. As the finder of fact, the jury was entitled to reconcile any differences and inconsistencies in the testimony and determine that the manifest weight of the evidence supported a finding of guilt. See State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus. Thus, this Court will defer to the factfinder's judgment on matters of credibility. State v.Young, 9th Dist. No. 22636, 2006-Ohio-68, at ¶ 35, citing Statev. Lawrence (Dec. 1, 1999), 9th Dist. No. 98CA007118, at *6.
 {¶ 61} Based on the foregoing, this Court cannot find that Appellant's convictions were against the manifest weight of the evidence. Furthermore, as previously stated, "a determination that [a] conviction is supported by the weight of the evidence [is] also * * * dispositive of the issue of sufficiency."Roberts, supra at *2. Accordingly, having found that Appellant's convictions were not against the manifest weight of the evidence, this Court need not discuss further his challenge to the sufficiency of the evidence. Thus, we find that the trial court did not err in denying Appellant's motion for acquittal.
 {¶ 62} Appellant's second and fourth assignments of error are without merit.
 Assignment of Error Number Three
"APPELLANT'S RIGHT TO DUE PROCESS OF LAW AS GUARANTEED BY THE 4TH, 5TH, 6TH AND 14TH AMENDMENTS TO THE U.S. CONSTITUTION AS WELL AS ARTICLE 1, § 10 OF THE OHIO CONSTITUTION WAS EFFECTIVELY DENIED BY HIS TRIAL COUNSEL'S INEFFECTIVE REPRESENTATION."
 {¶ 63} In his third assignment of error, Appellant has argued that his trial counsel was ineffective. Specifically, he has argued that he was denied effective assistance of counsel by his trial counsel's failure to object to the State's testimony which allegedly discussed Appellant's invocation of his right to remain silent. We disagree.
 {¶ 64} This Court employs a two-step analysis to determine whether the right to effective counsel has been violated. SeeStrickland v. Washington (1984), 466 U.S. 668, 687.
"First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." State v. McCoy (Jan. 30, 2002), 9th Dist. No. 20656, at *2, citing Strickland, 466 U.S. at 687.
This court need not address both prongs of the Strickland
test should it find that defendant failed to prove either. Statev. Ray, 9th Dist. No. 22459, 2005-Ohio-4941, at ¶ 10. See alsoState v. Bradley (1989), 42 Ohio St.3d 136, 143, certiorari denied (1990), 497 U.S. 1011, 110 S. Ct. 3258, 111 L.E.2d 768.
 {¶ 65} As stated above, Appellant has contended that defense counsel's failure to object resulted in ineffective assistance of counsel. However, this Court has consistently held that "trial counsel's failure to make objections is within the realm of trial tactics and does not establish ineffective assistance of counsel." State v. Taylor, 9th Dist. No. 01CA007945, 2002-Ohio-6992, at ¶ 76. See e.g., State v. Windham, 9th Dist. No. 05CA0033, 2006-Ohio-1544, at ¶ 24; State v. Guenther, 9th Dist. No. 05CA008663, 2006-Ohio-767, at ¶ 74. Moreover, given our disposition of Appellant's first assignment of error, we conclude that Appellant is unable to prove that trial counsel's failure to object to the disputed testimony prejudiced his defense.
 {¶ 66} Appellant's third assignment of error lacks merit.
 III {¶ 67} Appellant's four assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Boyle, J. concurs.
MOORE, J. CONCURS IN PART, SAYING:
 {¶ 68} I concur in the judgment of the majority to affirm the trial court's decision. However, I write separately with respect to Appellant's first assigned error as I would find a violation of Appellant's Fifth Amendment privilege against self incrimination.
 {¶ 69} The privilege against self incrimination is one of the quintessential rights afforded by the Fifth Amendment to the U.S. Constitution.
"[T]he Fifth Amendment right of protection against self-incrimination forbids the prosecution and the court from commenting on an accused's silence or failure to take a witness stand because of an unwarranted inference that the jury can draw from such comments." State v. Samilton (Apr. 16, 1992), 8th Dist. No. 60265, at *4; see Wainright v. Greenfield (1986),474 U.S. 284, 291.
 {¶ 70} Upon review of the officer's testimony, the majority finds no inference that Appellant's silence could be construed as indicating his guilt because the officer did not expressly testify that Appellant refused to make a statement. However, while the questions posed by the prosecutor to the officer did not directly elicit testimony as to whether Appellant had invoked his right to remain silent, I see no other purpose for the State to have initiated this line of questioning. The State repeatedly asked questions regarding how many persons witnessed the incident. They followed those questions with inquiries of how many of those persons gave statements. Here, the logical inference from the State's questioning of the officer is that Appellant was the only witness present at the shooting and at the earlier incident that did not provide a statement to the police.
 {¶ 71} In State v. Maggard (June 4, 1999), 2d Dist. No. 17198, the Second District Court of Appeals reversed the trial court's decision denying the defendant's motion for a mistrial after the prosecutor commented on his silence in its case in chief. As in the within matter, the prosecution did not specifically ask whether the defendant provided a statement. However, the prosecution repeatedly inferred that the defendant did not tell the police his version of the events surrounding the crime. The court found that the prosecution's repeated references were particularly prejudicial because they were used during the direct and redirect examination of a police detective in the case-in-chief.
 {¶ 72} I find the following reasoning from Maggard
particularly applicable to the within matter:
"[T]his type of violation is troublesome, especially where, as here, the evidence appears to be offered solely to imply that the defendant is guilty because he did not assert his innocence or make statements to the police." Id. at *12.
 {¶ 73} To suggest, as the majority does, that the questions and testimony do not violate the Fifth Amendment because the officer did not specifically comment on Appellant's failure to provide a statement is to subvert the protection of, and policies behind the Fifth Amendment privilege against self incrimination. "What the jury may infer, given no help from the court, is one thing. What it may infer when the court solemnizes the silence of the accused into evidence against him is quite another." Griffinv. California (1965), 380 U.S. 609, 614. The State does not only violate a defendant's Fifth Amendment privilege when it specifically states that the defendant did not provide a statement. A Fifth Amendment violation also arises when the Stateinfers that the defendant invoked his right to remain silent. A prosecutor can easily create an inference regarding a defendant's decision to invoke his or her Fifth Amendment privilege to remain silent without specifically asking or eliciting testimony that blatantly refers to the defendant's refusal to provide a statement. I find the State's behavior particularly egregious in light of the trial court's instruction to the State that it should not comment on Appellant's decision to remain silent.
 {¶ 74} In the present case, the clear inference from the testimony is that had Appellant been innocent, he would have spoken to the police and explained what happened, but because he knew he was guilty, he invoked his right to remain silent. I would find, as did the Second District Court of Appeals inMaggard, that the State's substantive use of Appellant's invocation of his right to remain silent substantially undermines the protection and policies of the Fifth Amendment privilege against self-incrimination. Under these circumstances, it was error for the trial court to allow the statements of the officer regarding Appellant's failure to provide a statement when questioned by police at the scene. However, in contrast toMaggard, I would find that the record below contains overwhelming evidence upon which a conviction would stand apart from this error. See State v. Williams (1983),6 Ohio St.3d 281, 290 ("Where evidence has been improperly admitted in derogation of a criminal defendant's constitutional rights, the admission is harmless `beyond a reasonable doubt' if the remaining evidence alone comprises `overwhelming' proof of defendant's guilt," quoting Harrington v. California (1969),395 U.S. 250, 254). Consequently, I find this error harmless.
[1] This incident occurred on or about October 15, 2004. For a discussion of the incident, see ¶ 33, infra.