DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Appellant, Tori R. Smith, appeals his conviction out of the Summit County Court of Common Pleas. This Court affirms.
 I. {¶ 2} Appellant was indicted on two counts of felonious assault, one in violation of R.C. 2903.11(A)(1)/(A)(2) and the other in violation of R.C. 2903.11(A)(2), both felonies of the second degree. At the conclusion of trial, the jury found appellant guilty of the first count and not guilty of the second count. The trial court sentenced appellant accordingly. Appellant timely appeals, raising two assignments of error for review. *Page 2 
 II. ASSIGNMENT OF ERROR I "APPELLANT'S CONVICTION WAS BASED ON INSUFFICIENT EVIDENCE."
 {¶ 3} Appellant argues that his conviction was based on insufficient evidence. Specifically, appellant argues that the State failed to present sufficient evidence to establish that appellant was a complicitor in the commission of felonious assault as against the victim Jemall Benjamin. This Court disagrees.
 "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Galloway (Jan. 31, 2001), 9th Dist. No. 19752.
 {¶ 4} The test for sufficiency requires a determination of whether the State has met its burden of production at trial. State v. Walker (Dec. 12, 2001), 9th Dist. No. 20559; See, also, State v. Thompkins (1997),78 Ohio St.3d 380, 390.
 {¶ 5} Appellant was convicted of one count of felonious assault in violation of R.C. 2903.11(A), which states:
 "No person shall knowingly do either of the following: (1) Cause serious physical harm to another or to another's unborn; (2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance." *Page 3 
 {¶ 6} R.C. 2901.01(5) defines "serious physical harm to persons" as any of the following:
 "(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;
 "(b) Any physical harm that carries a substantial risk of death;
 "(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
 "(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;
 "(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain."
 {¶ 7} R.C. 2901.01(3) defines "physical harm to persons" as "any injury, illness, or other physiological impairment, regardless of its gravity or duration."
 {¶ 8} R.C. 2901.22(B) states:
 "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."
 {¶ 9} The alleged deadly weapon in this case is a lead pipe.
 {¶ 10} The State argued that appellant was guilty as a complicitor in this case. R.C. 2923.03 states:
 "(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following: (1) Solicit or procure another to commit the offense; (2) Aid or abet another in committing the offense; (3) Conspire with another to commit the *Page 4 
offense in violation of section 2923.01 of the Revised Code; (4) Cause an innocent or irresponsible person to commit the offense."
 {¶ 11} This Court has held that "[a] defendant may be convicted of the principal offense if it is established that the defendant acted in complicity with another." State v. Anderson, 9th Dist. No. 22845,2006-Ohio-5048, at ¶ 28. In this case, the trial court provided an instruction to the jury within the concept of complicity as an aider or abettor. The Ohio Supreme Court has enunciated the following requirements for a conviction for complicity by aiding and abetting:
 "To support a conviction for complicity by aiding and abetting * * *, the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." State v. Johnson (2001), 93 Ohio St.3d 240, syllabus.
 {¶ 12} During trial, appellant moved for a judgment of acquittal pursuant to Crim.R. 29 at the conclusion of the State's case-in-chief and again at the conclusion of all the evidence. The trial court denied the motions.
 {¶ 13} In this case, appellant's co-defendant Jamar Holmes pled guilty to felonious assault as against the victim Jemall Benjamin.
 {¶ 14} At trial, Susan Kamvouris of the City of Akron Safety Communication Division testified that she is the keeper of records, that she catalogs and codifies all 9-1-1 tapes that the Akron Police Department Communication Center receives. She testified to the authenticity of a tape of a 9-1-1 call that was received on July 17, 2005 at approximately 3:42 a.m. The tape *Page 5 
was played for the jury. On the tape, a man who identified himself as "Lee Jones" reported that a man in the University Commons apartments in Akron was hit in the head with a pipe. Mr. Jones reported that his friend's head was split in a couple different spots and that he was "leaking."
 {¶ 15} Robert Arnold testified that he is a paramedic for the City of Akron and that he was dispatched at 3:42 a.m. on July 17, 2005 to 600 Sherman Street in Akron, Summit County, Ohio, regarding a fight with injuries. Mr. Arnold testified that the victim, Jemall Benjamin, was disoriented, had lacerations to his head and was bleeding profusely. Mr. Arnold surmised that the injuries were strike wounds from a bat or other type of pipe object. He testified that he and his partner braced Mr. Benjamin's neck, put him on a backboard and executed a "load and go." Mr. Arnold explained that a loud crowd had gathered and the scene had become hostile, so he and his partner removed the victim and left the area quickly in the interest of safety.
 {¶ 16} Officer Heath Smith of the Akron Police Department testified that he was dispatched to a call regarding a fight with injuries at 600 Sherman Street at approximately 3:00 a.m. on July 17, 2005. He testified that, as he approached the scene, a crowd of 10-12 people came toward him, trying to tell their stories about what had happened. The officer testified that he located the victim and tried to speak with him, but that the victim was not very responsive. Officer Smith testified that the victim's head was "all cut open with blood all over his face, head *Page 6 
and body." He identified the victim as "Jemall." Officer Smith further identified photographs of Jemall Benjamin, asserting that he was the victim who suffered lacerations to his head.
 {¶ 17} Officer Smith testified that he was able to analyze the crime scene. He testified that there was a trail of blood leading down from apartment 21, as well as a lot of blood inside the apartment and by the open door. In addition, he testified that a black Jeep pulled up, and the crowd began to shout, "That's him. That's the guy that took them out of here," referring to the suspects.
 {¶ 18} Officer Smith identified the Jeep's driver as Jessee Scott. He testified that Mr. Scott identified the suspects as appellant, appellant's brother Jamar Holmes, and Holmes' girlfriend Marva Davis. He testified that he learned that appellant was living in apartment 21 and that the assault of the victim took place in that apartment.
 {¶ 19} Detective David Hayes of the Akron Police Department Crime Scene Unit testified that he was called to respond to the scene at 600 Sherman Street, apartment 21, at approximately 4:08 a.m. on July 17, 2005. He testified that he took photographs of the scene. The photographs showed blood inside apartment 21 and a trail of blood leading away from the apartment.
 {¶ 20} Jessee Scott testified that his girlfriend manages the apartment complex in University Commons. He testified that he lives with his girlfriend. *Page 7 
Mr. Scott testified that appellant was living in the same apartment complex on July 17, 2005, specifically in apartment 21.
 {¶ 21} Mr. Scott testified that, in the middle of the night of July 17, 2005, appellant knocked on his door, as another man stood behind appellant, yelling. Mr. Scott testified that appellant was upset because of an on-going problem involving other people who were residing in apartment 21 but who were not on the lease. He testified that his girlfriend advised appellant to call a lawyer, the home office manager, or the police to address the problem.
 {¶ 22} Mr. Scott testified that he then just wanted to go back to sleep, but appellant asked him to bring appellant to his brother's apartment "down the street off Thorton." Mr. Scott agreed to do so. He testified that when he arrived in the area of appellant's brother's apartment, a man and a woman were in the street waiting. He described the man as a taller gentleman with a bald head and wearing a "wife beater," a white sleeveless tee shirt. Mr. Scott testified that the man and woman got in his vehicle and they drove back to appellant's apartment complex.
 {¶ 23} Mr. Scott testified that appellant, appellant's brother and the woman got out of his vehicle in the parking lot. He testified that he began to feel sick after a night of drinking, so he got out of the vehicle and vomited. Mr. Scott testified he then noticed a commotion, people scattered and shouting. He testified that he then saw the man in the wife beater coming back from the bottom of the driveway. Mr. Scott testified that appellant, appellant's brother and the woman *Page 8 
returned to his vehicle. He testified that appellant's brother kept repeating, "I don't play games. I don't play games." Mr. Scott testified that appellant told him that they had to get out of there and return to his brother's house. Mr. Scott testified that he knew that the three had been in a fight.
 {¶ 24} Mr. Scott testified that as he was returning appellant's brother and the woman to their home off Thornton, appellant's brother opened the rear window of his vehicle and threw something out of the window. He did not see what kind of object was ejected from the vehicle. Mr. Scott testified that he dropped appellant's brother and the woman in the vicinity where he first picked them up, but not in the exact same location.
 {¶ 25} Mr. Scott testified that he then drove appellant back to the University Commons area. He testified that appellant told him that the three of them had been in a fight. He then dropped appellant off at a house other than his own, two blocks behind University Commons. Mr. Scott testified that he then returned to his own apartment driveway, where he was stopped by two police officers. He testified that the crowd was shouting that he was the person who "took them away."
 {¶ 26} Mr. Scott testified that he did not see any weapons that night. He further testified that he was very intoxicated that evening.
 {¶ 27} Jemall Benjamin testified that he is a student athlete at the University of Akron. He testified that he was attending summer classes in July *Page 9 
2005, but he did not have a place to stay at that time at the university. He testified that he was, therefore, staying in his friend Dane Evans' apartment, specifically apartment 21 on Sherman Street. He admitted that he was not on the lease and did not pay rent, although he asserted that he gave Dane some money. Mr. Benjamin understood that appellant was living in the same apartment at the time.
 {¶ 28} Mr. Benjamin testified that the day before the incident, appellant came to the apartment and told him to leave. Mr. Benjamin testified that he left but returned later in the evening when his friend Dane was again in the apartment. He testified that Dane was leaving for a club, but he was not old enough to accompany him. Therefore, Mr. Benjamin stayed in apartment 21 that evening.
 {¶ 29} Mr. Benjamin testified that he fell asleep on the couch in apartment 21, and the next thing he remembered was waking up in an ambulance. He asserted that he had not been drinking that evening. He testified that he suffered four long lacerations on his head and one on the side of his head, and that he received more than 20 staples to close them. He testified that he spent five days in the hospital because of his injuries. Mr. Benjamin testified that he did not know who attacked him.
 {¶ 30} Dane Evans testified that he was living in the 600 block of Sherman Street, apartment 21, in Akron, at the time of the incident. He testified that he rented one of four bedrooms in the apartment, appellant rented one bedroom, two other bedrooms were locked and unrented, and that the apartment shared a *Page 10 
common living room and kitchen. Mr. Evans testified that he had had two parties in the few days he had lived there and that appellant was upset because other people were staying in the apartment.
 {¶ 31} Mr. Evans testified that he went out drinking at a club the evening before the incident. When he returned home after the bar closed, he saw Jemall Benjamin sleeping on the couch in the community living room in the apartment. He testified that he then went back outside because there were a lot of girls outside and there was music playing. Mr. Evans testified that he looked up to his apartment and saw what looked like a drunk person falling down the steps. He testified that he realized it was Jemall Benjamin and that Jemall's white tee shirt was red, and there was "gushing blood, thick blood everywhere." He testified that he asked Jemall what happened, but Jemall did not know.
 {¶ 32} Mr. Evans testified that he then saw three people running down the steps from his apartment towards him. He asserted that the "big guy" who he identified as Jamar, came at him with a six-inch steel pipe in his hand. He testified that his friend Raychade was near him. Mr. Evans testified that appellant then screamed at his brother, "That's Raychade. Don't hit Raychade." He testified that he then "squared up" with Jamar, when he felt "a little shot." He testified that he saw Marva Davis behind him with a chrome pipe. He asserted that he believed she had hit him. Mr. Evans testified that he then turned to face appellant, appellant's brother and girlfriend at the same time. He testified that all three of *Page 11 
them hopped in the car with Jessee Scott and drove away. Mr. Evans concluded that, although he was intoxicated, he had the presence of mind to observe and comprehend the events of the evening.
 {¶ 33} Detective Steven Mara of the Akron Police Department Major Crimes Unit testified that he was assigned to investigate the July 17, 2005 Sherman Street incident as a felonious assault. He testified that he went to Akron General Medical Center to check on Jemall Benjamin's condition, although he was unable to interview him at that time. He testified that he ultimately interviewed several people on July 20, 2005, regarding the incident. Based on his investigation, the detective was able to identify appellant, Jamar Holmes and Marva Davis as suspects in the felonious assault. Detective Mara testified that warrants were issued for appellant and Jamar and that the two were located in a house on Nathan Street and arrested.
 {¶ 34} Detective Mara testified that he read appellant hisMiranda rights and began to interview appellant. He testified that appellant told him that he was upset because there were people living in his apartment and they were not on the lease. He testified that appellant told him that he had nothing to do with the incident and he did not get anybody to pick up his brother and brother's girlfriend and bring them back to the scene. The detective testified that he asked appellant what happened that evening, but appellant then asked for a lawyer, so the detective terminated the interview. *Page 12 
 {¶ 35} Detective Mara authenticated pictures of Jemall Benjamin, taken in the hospital and depicting his injuries. The pictures depict numerous lacerations on his head and many staples closing the wounds.
 {¶ 36} Detective Mara testified that no one told him that appellant ever had a pipe or struck anyone with a pipe. He testified, however, that he learned during his investigation that during the incident appellant was "directing who should be hit."
 {¶ 37} Finally, Marva Davis testified at trial. She testified to the following. Around 3:00 a.m. on July 17, 2005, her phone rang. She recognized appellant's voice and she immediately gave the phone to her boyfriend Jamar Holmes, who is appellant's brother. Jamar was on the phone for less than 30 seconds, did not say much, then hung up. Jamar then started getting dressed. Ms. Davis testified that she got up and got dressed because she wanted to make sure that Jamar was going to come back from wherever he was going. She asserted that she did not know what was planned.
 {¶ 38} Ms. Davis testified that appellant soon arrived at her home in a Jeep driven by another man she later learned was Jessee Scott. She testified that she and Jamar got in the Jeep and they were driven back to appellant's apartment complex. She testified that appellant and Jamar exited the vehicle, and Jamar told her he would be right back. She asserted that she remained in the vehicle. *Page 13 
 {¶ 39} Ms. Davis testified that a few minutes later she saw appellant and Jamar running down the steps from appellant's apartment and that they were being chased. She later testified that only Jamar went upstairs into appellant's apartment while appellant did not. She further later testified that only Jamar was being chased and that appellant merely began running with Jamar after he left appellant's apartment.
 {¶ 40} Ms. Davis testified that she and Mr. Scott drove and picked up appellant and Jamar and they all drove back to the vicinity of her home, where she and Jamar exited the vehicle. She asserted that there was no discussion in the vehicle as the four drove back to her home. Ms. Davis also denied possessing a weapon that evening or seeing a weapon in anyone else's possession.
 {¶ 41} Under the circumstances, this Court finds that there was sufficient evidence to permit any rational trier of fact to find that the essential elements of complicity to commit felonious assault were proven beyond a reasonable doubt. Viewing the evidence in a light most favorable to the prosecution, there was sufficient evidence to establish that appellant encouraged, assisted, advised or incited Jamar Holmes to cause serious physical harm to Jemall Benjamin by beating him with a pipe. There was evidence that appellant called Jamar in the middle of the night after he could obtain no relief from apartment management to address the situation of non-lessees living in his apartment. There was evidence that Jamar immediately got dressed and waited for appellant to pick him up. *Page 14 
There was evidence that appellant got Jessee Scott to drive to Jamar's home and pick up Jamar and his girlfriend and bring them back to appellant's apartment. Jamar was seen running away from appellant's apartment with a pipe and Jemall Benjamin suffered serious injuries to his head as a result of Jamar's attack. Dane Evans testified that Jamar came towards his friend Raychade as if to attack him, but appellant shouted for Jamar specifically not to hit Raychade. Mr. Evans was then hit in the head. Appellant's first assignment of error is overruled.
 ASSIGNMENT OF ERROR II "THE TRIAL COURT ERRED IN REMOVING A JUROR AND REPLACING HER WITH AN ALTERNATE IN THE MIDDLE OF THE TRIAL."
 {¶ 42} Appellant argues that the trial court abused its discretion by removing a juror and replacing her with the alternate. This Court disagrees.
 {¶ 43} This Court has held:
 "It is a discretionary function of the trial court to decide whether to remove a juror for bias. Berk v. Matthews (1990), 53 Ohio St.3d 161, 168. An appellate court reviews a trial court's decision to remove a juror and replace him with an alternate juror under an abuse of discretion standard. State v. Bryan, 101 Ohio St.3d 272, 2004-Ohio-971, at ¶ 80. An abuse of discretion is more than an error of judgment; it implies a decision that is `unreasonable, arbitrary, or unconscionable.' State v. Adams (1980), 62 Ohio St.2d 151, 157. Therefore, the trial court's decision to remove a juror will not be reversed on appeal unless it is `manifestly arbitrary[.]' State v. Tyler (1990), 50 Ohio St.3d 24, 31.
 "Crim.R. 24(F)(1) provides that: `[alternate jurors * * * shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties.' Crim.R. 24 implicitly grants the trial court the authority to *Page 15 
`sua sponte dismiss a juror when it determines that * * * a juror is not impartial or is otherwise unsuitable for service.' State v. Midwest Pride IV, Inc. (1998), 131 Ohio App.3d 1, 20." State v. Wyatt, 9th Dist. No. 22070, 2004-Ohio-6546, at ¶¶ 6 and 7.
 {¶ 44} In this case, a juror approached the bailiff at the conclusion of all the evidence, but before the trial court had instructed the jury regarding the law or the jury had begun deliberations. The juror indicated that she was uncomfortable and offended by some language used during trial. The trial court conducted an in camera questioning of the juror to determine whether she could remain impartial under the circumstances.
 {¶ 45} The juror informed the trial court that she resented the fact that counsel and witnesses had described people involved in the case as "black." The juror asserted that distinguishing people by color was offensive to her. She asserted that it was clear who was involved; that they were people, not dogs or cats; and that referring to people as "black" was unnecessary. The juror asserted to the court, however, that she could remain unbiased in her consideration of the case.
 {¶ 46} The State moved for the removal of the juror for cause on the basis of bias. The State asserted that it was the State's witnesses who used the term "black" to describe the people involved in the incident. The State asserted that, had this issue arisen during voir dire, it would have moved for the juror's dismissal for cause at that time. The trial court agreed and noted that it would *Page 16 
have been unlikely that such an issue could have been revealed during voir dire. The State emphasized that this was an extraordinary event.
 {¶ 47} Appellant's counsel asserted that he was "stunned" by the juror's sensitivity and surprised that the descriptive term "black" as it relates to people would have such an effect on her. He stated that he believed she should not be removed, however, based on her assertion that she could remain unbiased. He concluded, "but wow." In addition, appellant's counsel admitted concern about the impact of the juror's sensitivities on his closing argument. He asserted, "The one thing I would hate to say, I am not going to monitor myself during closing argument — trying to think of everything I have to say for the satisfaction of this one juror."
 {¶ 48} After listening to counsel's comments and voir dire of the juror, the trial court concluded that the juror could not remain fair and impartial, despite the juror's assertions to the contrary, for several reasons. The trial court noted that the juror undeniably found the term "black" offensive enough to raise the issue with the court. The court found that the juror was not calm during their discussion of the issue. The court further found that it would put the attorneys "in a terrible position to try to do your job, which is to, you know, represent your client to the best of your abilities" given the juror's expressed offense. Under the circumstances, this Court cannot say that the trial court's reasons were manifestly arbitrary or that the court abused its discretion by removing the juror for cause and *Page 17 
replacing her with an alternate prior to the time the jury retired for deliberations. Appellant's second assignment of error is overruled.
 III. {¶ 49} Appellant's assignments of error are overruled. Appellant's conviction out of the Summit County Court of Common Pleas is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
 Costs taxed to appellant. *Page 18 
 SLABY, P. J., DICKINSON, J. CONCUR *Page 1